Well, may it please the court, my name is Robert Caldwell. I'm here at this party to represent Mr. Layton against social security and civility appeal. I will keep track of my own time, and I will try to reserve 20 minutes for rebuttal. It has to begin in a way that no attorney wants to begin. I made a mistake. On page 27 of my opening brief, I cite the regulation that ends in 9-1-2, and it's the wrong number. It's supposed to be 9-2-7, which is the small c, 9-2-2. I'm trying to apologize for the symptom. In this case, he has several issues, but I think there is one that is just positive. And of course, that is the opinion of the treating psychiatrist, Dr. Stumpf, whose opinion the ALJ disregarded. He agreed, according to the opinion of the state agency physicians, that a complaint of defiance is part of the initial reconsideration and terminations that are made before the request for hearing is even filed. He, this court, has stated on numerous occasions that those opinions are not themselves in service of substantial evidence to deny a case. That is exactly the situation we have here. That is the only evidence that the ALJ cited to support his decision. What has been ignored, with all due respect, by the commissioner in the response brief is the different standards that apply to this clinical opinion evidence. And I'm not telling this for anything, but I want to work it out. When I say the treating physician opinions are at the top of the hierarchy of clinical opinion evidence, I would submit that the highest standard, the very convincing standard, applies here. And the reason I say that is that if state agency physician assessments are in substantial evidence, then in substantial evidence, chronologically, they need to be considered to contradict substantial evidence, which, of course, that is what Dr. Stolfi's opinion is. So because it is not even contradicted by substantial evidence, it stands alone as the treating physician opinion evidence in this case. Perhaps at their own standard, even the lesser standard of specific and legitimate reasons for rejecting and contradicting the treating physician opinion, I think the ALJ reasons still fail. And they're contained in one paragraph, three reasons. One, Dr. Stolfi's response was dissipated by way of questioning. This court has called that, in many instances, heresy, swallowing, porn. So that is not a reason for rejecting the treating psychiatrist opinion. And I think it's significant that Dr. Stolfi came on the board shortly after Daniel was hospitalized for this terrible brain injury, almost injured his neck. And so Dr. Stolfi's the doctor who has really the most experience with Daniel when Daniel has suffered the greatest, what do you call it, breakdown from the psychiatric symptoms. The other reason the ALJ came was, frankly, the ALJ's own medical opinion. The ALJ stated, well, there's no support for this in the medical records. And I think that's a very important issue to consider. Because medical records are not an assessment-supporting activity. So we're comparing two things that do not bear comparison. The one thing that I noticed in the commissioner's response was this very heavy reliance upon what are called mental state examinations. And the other heavy reliance on what they call GAF symptoms. And the problem with that heavy reliance in both instances is that those findings are not meant to assess work capacities in terms of what an individual will do on a regular and continuing basis, which is what the commissioner's standard requires. Mental status examinations are mentioned 11 times in the response brief. GAF scores are mentioned six times in the response brief. Is that what the commissioner is relying so heavily upon? I don't know if that's fair to say that he's solely or mostly relying on the GAF scores. It seems like the ALJ went through most of the doctors who noted that Dr. Stump, I think specifically said that Dr. Stump himself reported largely normal mental functioning in his treatment. I don't know if that's true. I mean, it seems like for the most part all the time that Dr. Stump was reviewing your client, he was within what was deemed the normal range that he did have, that Dr. Stump did know that he had some aggression or some aggressive tendencies. But he also talked about the mothers, their party report, and then he also spoke about the two others, ADHD doctors, Dr. Estes and Dr. Foster. So I'm trying to figure out, I mean, it seems like because they were contradicting what Dr. Estes and Dr. Foster were contradicting what Dr. Stump says, that makes a specific legitimate reason that we hope for. And why is it what the ALJ said specific and legitimate enough? There's a couple of answers. Okay. The one is, as I said at the very beginning, they're kind of in that they think that it should be a higher burden. And tell me why. Even if it's the lower burden that this court has not many, many times to state agency physician opinions that are written before the request for hearing is even fulfilled are not substantial evidence. The better argument is that Dr. Stump had hands-on experience and you made a very good point, Judge Arcand, and you said it is the sightline of this young man's symptoms. Because that's what interferes with the ability to sustain work on a regular and continual basis. He definitely might not disagree at times of what's called normality, but that's not what interferes with his ability. His ability is the sightline. And Dr. Stump noted that repeatedly. And so that is the essence. Yeah, but he didn't just check the boxes. I think one of the arguments that you presented was that he just checked the boxes because those are primarily what I would check boxes and do. Well, that's quite accurate. He seemed to have a focus specifically on, you know, reasons set out in the medical notice that supported his hard-of-seeing determination of simple, unskilled work and why he was trying to be able to do it. So, basically, everything he had in front of him. I know I'm blabbing every time I look at that. The ELJ did not. The ELJ relied almost exclusively upon the emergency status examinations, which are a snapshot in time. They're in a treatment setting. They don't tell us anything about the person who's symptoms cycle, in terms of the ability to sustain work. And the same thing goes for the GAF scores. And if you look at the ELJ decision, that's what he relied upon. Well, listen, Dr. Schaub's assessment, largely consistent with assessments by Dr. Shively, Dr. Day, St. Luke's report, Dr. Redd, Patty Benson, and I think that's all the containers were on. The first answer is these were all before the EDSS item, but they should not have been. Absolutely. If one looks carefully at those reports, they were all qualified. The one I thought was most compelling was Dr. Shively's report. If you read it, things look pretty good. It's all up until the end. And then if you look at the last paragraph, she says, this young man is going to need continuing psychological care. This young man will never function independently. He will have to have a sheltered environment for his entire life. So things look pretty good. Hopeful comments about what might happen in the future. But when it comes down to what this young man would actually be able to accomplish, the doctor said, his sheltered environment for the rest of his life. That's not a picture of someone that can function on a regular and continual basis. I have a full line to consider. So that's it. Thank you. Thank you. I'll give you a minute. Sure. Thank you. I appreciate that. Thank you. How do you feel? My name is Richard Puro. I'm Senior Commissioner for Social Security on this side. If this is a case where someone is considered visually benefited In an ill parent is limited ability to do certain jobs. But with all of the evidence, including visual experts, mental status examinations, clinical findings, IQ, and even the entirety of the record, show that there are still some jobs he could perform and would be able to not perform any jobs he would receive. In fact, Mr. Lincoln, so often asked why he's not working, responded that he just never got around to looking for a job. The only medical opinion that effectively states that he could not perform any job would be Dr. Stump's questionnaire. However, that one medical opinion was unsupportable for himself, also unsupported by the clinical findings of Dr. Stump himself, and contradicted by clinical findings by Dr. Wong, Dr. Yang, psychologist Dr. Seible, J.D.M.C. physicians, Dr. Vestas, and Dr. Foster. I want to ask you about a useful part that's really troubling me. Given that the ALJ credited the reports from Dr. Vestas and Dr. Foster on this, did the ALJ adequately account for the thought or limitations that they discussed in their reports with respect to his ability to complete a normal workday working without interruption from psychologically-based symptoms? Yes, because he followed the same, concrete social limitations that those doctors found themselves. And while they found some other mental limitations, for instance, in race, that didn't show up in their ultimate conclusion, their ultimate conclusion on the concrete workplace limitations was that any person could perform simple work with limited non-social interaction. And it's extremely similar to the Stain and Stub's case, the Stain and Stub's case, where, in that case, a genuine psychologist and a state agency psychologist also found limitations in pace and some other moderate limitations, but ultimately concluded that the restrictions in the workplace were to do some work with repetitive work and with limited social interaction. And then Clark found that, in that case, where they had previously stated there were some other moderate limitations, but ultimately concluded that they could perform simple repetitive work with limited social interaction. And, in fact, their ultimate conclusion in adopting those limitations, you see by the R on the ALJ, referring to that, he also had adopted those same limitations. By referring to Clark here, the state agency's ultimate conclusion that they did find those limitations, but ultimately found even with those limitations, he could still perform simple work with limited social interaction. Well, I mean, yeah. I mean, Stub's investigation, really, makes the argument that the ALJ failed to adequately consider its main point of whether Mr. Lane can sustain work activities on a regular, continual basis. I mean, he talked about how, again, he takes a nap or he has to take a nap in the afternoon. There's a lot of different factors to address that, too. What's your response to that argument? Well, what I think the state agency psychiatrist does their exact job is to look at the medical records and to consider to what level the department holds them as a state agency with those level findings. And both state agency psychiatrists would have had to give more support with limited social interaction on a sustained basis. There's also, and it's consistent with other evidence, through the record, Dr. Shiley found that it was 0 millisquare seconds, which is average, that the memory helped many patients. I like that. Yeah, I'm sorry. I mean, they had a range of 15, 155. I was 75, and the most recent was 55. What do we do with that? I mean, did the ALJ, you know, maybe once we learned he had re-encountered from that wide range, what was the most recent he was in, like, over 10 years? Well, I mean, a 1 millisquare GF source are a fairly close snapshot, but there's multiple GF sources, and they're all in the modern range. And the reason Dr. Shiley, you know, his questionnaire was inconsistent is that he found 75% of the functional areas were largely severe. And it's higher than any GF source he made or any other located data. It was all in the modern range, and all those GF sources were also reviewed by the state agency. Oh, I'm sorry. But the bulk of the medical records and the GF sources were reviewed by state agency physicians, which accounted for those modern limitations. When they came up with their ALJ, they were based on what restrictions were in the workplace, and it was inconsistent with the ALJ's RFC. As to Dr. Stubbs' opinion, well, I'm certainly a pedagogist, and I don't base the argument that the state agency physician psychiatrist's opinions are non-substantial evidence. That's not consistent with his Portuguese lockdown, as he was... If they are inconsistent with other clinical findings or if they stand alone, they are non-substantial evidence. But in this case, they are supported by the clinical findings provided by the state's examinations from Dr. Wong, Dr. Stubbs himself, and Dr. Shiley. So they do not stand alone. They are supported. And under Dr. Stubbs' case, they do constitute substantial evidence and certainly can be the basis for the ALJ's decision. Also, as to the subjective complaints, I'd like to point out that in his testimony, there are no subjective complaints that would show that he was fully disabled. In fact, he said he wasn't, or that he wasn't moving because he had gotten out of work early. He testified to activities that he was meeting for a course that were inconsistent with the plan for disability. And then, of course, as mentioned before, the medical evidence, the occasional evidence, the clinical findings, also in contrast to a claim of total disability. So the ALJ, for the appropriate reasons, has had a lot of subjective complaints to the extent that they were claiming a good work, any job. So, you know, in considering the ALJ recently discounted his subjective complaints, he discounted Dr. Stubbs' questionnaire as being unsupported by the medical record, as well as Dr. Stubbs' clinical findings and treatment notes. And, in fact, on the same day that he performed that questionnaire, he said that Mr. Minkowski, who was a good client, gave him a GS-4, an L85, showing only post-moderate symptoms. And he used the question for his treatment notes. So there's a direct conflict between his little treatment notes and his questionnaire. In the case of Thomas Hetty, that was found to be a substantive legal reason to discount the opinion. We list those medical names that were made substantive. Of course, in this case, that would be an insubstantive legal reason. So this record would, as a whole, show that there were jobs that Mr. Minkowski did before, even with his limitations. So the ALJ system was supported by some phase limits when it was the government's decision. Thank you. Thank you. So, you know... How long do you think it might have been? I think the government just made my case for me in the sense that there's a GS-4 in a treatment setting, and there are work capacities to do the same thing. Normally, one does not read through the records at the court. But I'm going to read these a little bit, because a lot is donated to Dr. Shively. Here's her conclusion. Daniel should be assisted in contacting Arizona Department of Behavioral Health. Beginning the application for adult mental health services under the state's program for the Severe Mentally Ill Program. He is dependent on psychiatric services, medication, and case management services to maintain his mental health and to ameliorate mood swings and anger concomitant with his biological, excuse me, bipolar disorder. He will likely require supportive services for his lifetime. And these may include access to supportive living and housing as he grows older. The survey is not the description of a person who needs to stay at work. Thank you. Thank you. Mr. Jarrett, I'll follow up with you. Really, thank you both very much for your arguments today. The case of Lady versus Mary, all of these cases...
judges: Fernandez, Murguia, Watford